[Cite as *In re S.F.*, 2016-Ohio-5213.]

STATE OF OHIO            )          IN THE COURT OF APPEALS
                         )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT         )

IN RE: S.F.                         C.A. No.        27908


                                    APPEAL FROM JUDGMENT
                                    ENTERED IN THE
                                    COURT OF COMMON PLEAS
                                    COUNTY OF SUMMIT, OHIO
                                    CASE No.     DN13-12-0790

DECISION AND JOURNAL ENTRY

Dated: August 3, 2016

WHITMORE, Judge.

{¶1}    Appellant, Stephen F. ("Father"), appeals from a judgment of the Summit County
Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child
and placed him in the permanent custody of Summit County Children Services Board ("CSB").
This Court affirms.

I

{¶2}    Father is the biological father of S.F., born November 19, 2013. Although S.F.'s
mother ("Mother") did not appeal the trial court's judgment, some facts about her are relevant to
the appeal because she and Father continued to reside together throughout this case.

{¶3}    S.F. was born at 33 weeks' gestation and remained in the hospital's neonatal
intensive care unit for a few weeks after his birth. Hospital staff contacted CSB because of
concerns about the unstable mental health of both parents and their inability to appropriately care

for S.F. CSB filed a dependency complaint and S.F. was removed from his parents' custody before he was released from the hospital.

{¶4} S.F. was later adjudicated a dependent child and placed in the temporary custody of CSB. The case plan goals for Father focused primarily on his unstable mental health. He was diagnosed with schizoaffective disorder, bipolar type, and narcissistic personality disorder. His bipolar schizoaffective disorder is a mood and thought disorder that involves mood swings that are sometimes accompanied by psychotic episodes. The psychologist who evaluated Father explained that he would require life-long management of his psychiatric medications to stabilize his moods and prevent him from hallucinating.

{¶5} The expert described Father's narcissistic personality disorder as a chronic condition that is more difficult to treat because it cannot be managed with psychiatric medications. He explained that people with this disorder falsely believe that they have special powers and abilities, seek continual recognition from others, and expect to be treated as if they are special. The expert gave several examples of Father describing himself in "very grandiose" terms that were impossible to believe, such as having talents and an exceptional level of intelligence that he did not. The treatment recommended for Father's narcissistic personality disorder was long-term counseling.

{¶6} Father began counseling during this case but did not attend regularly. After eleven sessions, he was terminated from counseling because of excessive absences. His counselor explained that Father made little progress in counseling because he did not recognize that he needed to change anything about himself. Father admitted that he had been diagnosed with bipolar disorder as a teenager but that he had stopped taking medication because he did not agree with the diagnosis. During this case, CSB was unable to verify whether Father was taking

any psychiatric medications. Moreover, several witnesses testified about him behaving in an irrational, erratic, and/or threatening manner throughout this case.

{¶7} Mother likewise made little progress on the reunification goals of the case plan. Mother suffers from mental health problems and is intellectually disabled. She admitted that she would sometimes "flip out" and become physically aggressive toward Father and others. Mother engaged in some mental health services during this case but was also terminated from counseling for missing too many appointments. She did not stabilize her mental health, gain insight into the needs of S.F., or obtain safe and stable housing.

{¶8} CSB eventually moved for permanent custody of S.F. Father later moved for a six-month extension of temporary custody. Following a hearing on the alternate dispositional motions, the trial court terminated parental rights and placed S.F. in the permanent custody of CSB. Father appeals and raises two assignments of error.

II

Assignment of Error Number One

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED FATHER'S PARENTAL RIGHTS RATHER THAN GRANTING A SIX MONTH EXTENSION.

{¶9} Father's first assignment of error is that the trial court erred in terminating his parental rights rather than granting a six-month extension of temporary custody. Before a juvenile court may terminate parental rights and award permanent custody of children to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the children are abandoned; orphaned; have been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; they or another child in a parent's custody have been adjudicated abused, neglected, or dependent on three separate

occasions; or they cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996). The trial court found that CSB satisfied the first prong of the permanent custody test because S.F. had been in its temporary custody for more than 12 of the prior 22 months at the time it moved for permanent custody. Father does not dispute that finding.

{¶10} Father focuses his argument on the trial court's finding that permanent custody was in the best interest of S.F. He asserts that the trial court should have instead granted a six-month extension of temporary custody. The trial court was required to conduct a best interest analysis to determine whether to place the child in the permanent custody of the agency or to extend temporary custody. If permanent custody was in the best interest of S.F., the alternative disposition of extending temporary custody was not. *See In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10. Moreover, the trial court would have had authority to extend temporary custody only if it also found that Father and/or Mother had made "significant progress" on the case plan and that there was reasonable cause to believe that S.F. would be reunified with them or otherwise permanently placed during the extension period. R.C. 2151.415(D)(1). As detailed above, neither parent had made significant progress on the reunification goals of the case plan.

{¶11} We agree with the trial court that CSB demonstrated by clear and convincing evidence that permanent custody was in the best interest of S.F. When determining the child's best interests under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, his wishes, the custodial history of

the child, and his need for permanence in his life. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Although the trial court is also required to consider any relevant factors under R.C. 2151.414(E)(7) through (11), none of those factors applied to the facts of this case. *See id.*

{¶12} The parents' interaction with S.F. during this case was limited to supervised visits because neither parent made progress on the mental health component of the case plan. Mother interacted with S.F. more than Father, but she required continual prompting by the supervisor to ensure the safety of the young child. Mother did not understand the child's developmental ability and would sometimes leave him in an unsafe position, such as alone on a couch or changing table. Visitation was initially scheduled for twice a week but was later reduced to once a week because Mother and Father missed many of the visits. Father missed considerably more visits than Mother and would either fail to explain his absence or offer a poor excuse. For example, Father missed one visit because he claimed that he had stayed up too late the night before playing video games.

{¶13} During the visits, Father relied on Mother to care for S.F. and did not pay much attention to the child. Mother did not understand how to care for S.F. and often became impatient with the young child, yet Father did not step in to help unless he was told by the supervisor to do so. The guardian ad litem testified that there did not seem to be a bond between S.F. and his parents. Another witness observed that, although S.F. did not seem to be fearful of his parents, he also was not excited to see them.

{¶14} The caseworker and guardian ad litem testified that all of S.F.'s basic and special needs were being met in the foster home, where he had lived since he was two months old. The child looked to his foster parents for love and support. Both the caseworker and the guardian ad

litem had observed a bond between S.F. and his foster family. The guardian ad litem testified that the foster parents wanted to adopt S.F. and were willing to maintain a relationship with Mother and Father.

{¶15} Because S.F. was less than two years old at the time of the hearing, the guardian ad litem spoke on his behalf and opined that permanent custody was in his best interest. She emphasized that the parents had difficulty meeting even the basic needs of S.F. She believed that they lacked any understanding of the developmental needs of a child and did not implement the skills that they should have learned in parenting classes. She also expressed concern about the parents' untreated mental health problems.

{¶16} Because S.F. had spent his entire life living outside his parents' custody, he was in need of a legally secure permanent placement. Neither parent was prepared to provide S.F. with a suitable home at that time. CSB had contacted several relatives about providing a home for S.F., but had been unable to find any relative who was willing and able to do so. Consequently, the trial court reasonably concluded that a legally secure permanent placement would only be achieved by terminating parental rights and that permanent custody was in the best interest of S.F. Father's first assignment of error is overruled.

### Assignment of Error Number Two

> THE TRIAL COURT COMMITTED PLAIN, REVERSIBLE, AND STRUCTURAL ERROR WHEN IT ALLOWED TESTIMONY FROM AN UNSWORN WITNESS AND THEN BASED [ITS] DECISION UPON THE TESTIMONY OF SAID UNSWORN WITNESS IN VIOLATION OF FATHER'S STATE CONSTITUTIONAL RIGHTS AS GUARANTEED BY ARTICLE I, §7 OF THE OHIO CONSTITUTION.

{¶17} Father's second assignment of error is that the trial court committed plain error by allowing the foster mother to make an unsworn statement at the hearing. At the conclusion of the evidence, before closing arguments, the trial judge acknowledged that the foster parents were

in the courtroom and asked whether they would like to make a statement to the court because "[t]he statute does provide that they are permitted to, but certainly not required to, make a statement."

{¶18} This Court addressed a similar argument in *In re G.D.*, 9th Dist. Summit No. 27855, 2015-Ohio-4669, ¶ 38, in which we recognized that, although R.C. 2151.424(A) grants a foster parent the right to testify as a sworn witness at the permanent custody hearing, "[w]e are not aware that the law affirmatively provides for foster parents to make unsworn statements in permanent custody proceedings." As in this case, the father in *In re G.D.* failed to raise an objection at the hearing to the foster parent's statement, so he forfeited all but plain error. *Id.* This Court concluded that G.D.'s father failed to demonstrate plain error because he could not demonstrate that the trial court based its decision on anything that the foster parent said. *Id.* at ¶ 39–43.

{¶19} In this case, the foster mother made a brief statement to the court, in which she stated that S.F. had come into her home as a small, premature baby and had grown "through his physical and occupational therapy and speech therapy too." She also emphasized that Mother and Father had always been very loving and that she does care about them.

{¶20} The trial court did not refer to the foster mother's statement in its decision. Its brief findings about the foster parents were that S.F. had lived with them since his release from the hospital, that he was bonded with them as the only family that he had ever known, and that the foster parents hoped to adopt S.F. if permanent custody was granted. All of those findings were based on the sworn testimony of the caseworker and the guardian ad litem, as detailed above, not anything that the foster mother said.

**{¶21}** Father has failed to demonstrate that the foster mother's statement affected the outcome of these proceedings so as to rise to the level of plain error. Father's second assignment of error is overruled.

### III

**{¶22}** Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

DENISE E. FERGUSON, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

JOE KERNAN, Attorney at Law, for Appellee.

BRIAN ASHTON, Attorney at Law, for Appellee.